UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES 1 – 16,

Plaintiffs,

Case No.
Hon.

v.

THE REGENTS OF THE
UNIVERSITY OF MICHIGAN;
and the UNIVERSITY OF MICHIGAN,

Defendants.

---

PITT MCGEHEE PALMER BONANNI &
RIVERS, P.C.
Michael L. Pitt (P24429)
Kevin M. Carlson (P67704)
Danielle Y. Canepa (P82237)
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com
*Attorneys for Plaintiffs*

---

## COMPLAINT AND JURY DEMAND

Plaintiffs played for the University of Michigan Men's Ice Hockey Team between 1984 and 2001. During that period, the Hockey Program adopted sexualized abuse as part of its standard hazing traditions, including forced shaving of genitals,

tying men's testicles to hockey helmets or buckets weighted with hockey pucks, simulated sex acts, threatened outright sexual assault, and in some cases, anal penetration. Men as young as seventeen years old—new to adult life and in many cases dependent on hockey to access education at Michigan—were subjected to sexualized abuse that would be immediately recognized as torture under any other circumstance. The abuse was ritualized, meticulously planned, and sadistic.

These were not isolated incidents. The sexualized hazing was known to, directed, and facilitated for years by longtime Head Coach Red Berenson (1984-2017). Berenson instructed upperclassmen to shave only "from the neck down," so the abuse would be invisible when Plaintiffs were clothed. The sexualized hazing was part of Berenson's abusive coaching style: demanding extreme interpersonal deference, arbitrarily benching disfavored players, cultivating hostility to lowerclassmen, and other tactics that served to demoralize players to such an extent that they were desperate for approval and belonging on the team.

Coaching staff, many of whom were former players, knew of the abuse and took no action to stop it. Some coaching staff stopped by each year to observe the shaving and genital tying ritual. When one player reported the abuse and sought help from then-Assistant Coach Mel Pearson, Pearson replied, "keep your head down, don't piss them off, and just get through it." Pearson served as Assistant Coach from 1988-2011 and then Head Coach from 2017 to 2022.

At the time of the abuse, the vast majority of players believed their peers were responsible for the initiation—they were not aware of the role of Red Berenson and other officials in facilitating and concealing the abuse. Players did not realize and could not have realized the University's responsibility for the abuse. They did not have reason to know that others had previously complained to the University about the abuse. Nor did they have any way to know how the University responded to those prior complaints. The few players who did complain were met with dismissal. University staff normalized the abuse and conveyed to players that it was no big deal. Even if players had sought to escalate concerns or investigate further, this would have been futile because the University maintained no records of these complaints, even after the Clery Act required reporting such data beginning in 1990.

In 2012, Berenson announced the end of "freshman hazing," publicly acknowledging only tame traditions, such as requiring freshmen to eat last and carry upperclassmen's equipment.[1] But Berenson also vaguely acknowledged instances of more extreme hazing, noting that "[w]e've had captains that got too carried away, and they forgot what they're supposed to do."[2] Based on the hazing his freshman

---

[1] The Ann Arbor News, *Red Berenson eliminates hazing of freshmen from Michigan hockey program*, https://www.annarbor.com/sports/red-berenson-eliminates-freshman-hazing-from-michigan-hockey-program/ (Oct. 5, 2012).

[2] The Michigan Daily, *With captains help*, *Berenson eliminates freshman hazing*, https://www.michigandaily.com/uncategorized/berenson-eliminates-freshman-hazing-captains-help/ (Oct. 4, 2012).

players actually experienced from 1984 through 1999, Berenson in fact knew of and maintained control over a systematic ritual of sexual hazing during his coaching tenure that was neither "tame" nor the result of "captains that got too carried away." The hazing described by the Plaintiffs in this Complaint is exponentially more egregious than the hazing Berenson suggested to the press in 2012. He could have stopped it well before 2012. Instead, Berenson, Mel Pearson, and many other longtime other coaching staff, including Equipment Manager Ian Hume and Trainer Rick Bancroft, knew, accepted, and facilitated the sexual abuse for decades. Worse yet, the Defendants Regents of the University of Michigan ("Regents") and the University of Michigan (the "University") (together the "Defendants") conducted no inquiries or investigations of Berenson's vague acknowledgment that his captains had "got too carried away" with freshman hazing prior to 2012.

Plaintiffs bring this action against Defendants Regents of the University of Michigan ("Regents") and the University of Michigan ("the University"), (together "Defendants"), for Sex and Gender Discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"),[3] which

[3] Title IX protects students from sex-based discrimination, harassment, and violence in federally funded education programs. Rights include equal access to education, athletics, and resources, protection from sexual harassment/assault, accommodations for pregnant or parenting students, and prompt, equitable resolution of complaints by school administration.

prohibits sex discrimination in education, including discrimination in the form of sexual hazing. In support of their claims, Plaintiffs state as follows.

**Jurisdiction and Venue**

1. This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 USC 1331 and 20 U.S.C. § 1681 et seq.

2. The events giving rise to this action occurred in Washtenaw County, Michigan.

3. Venue is proper in the Eastern District of Michigan because the events giving rise to this cause of action occurred in this district and all Defendants reside and/or operate within this judicial district.

**The Plaintiffs**

4. Each Plaintiff was a student athlete at the University of Michigan and a member of the University of Michigan Men's Hockey Team at various times between the years 1984 and 2001.

5. All of the Plaintiffs were elite college athletes with the potential to play professional hockey in the minor leagues or the National Hockey League after college.

6. Nearly all of the Plaintiffs attended the University of Michigan on an athletic scholarship and depended on hockey to access their education.

7. Plaintiffs file this case using pseudonyms because of the extremely sensitive nature of the facts, as Plaintiffs were subjected to sexual assault, and this action will require disclosure of information "of the utmost intimacy." Plaintiffs are therefore entitled to protect their identities in this public filing by filing under a pseudonym. *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004) (citing *Doe v. Stegall*, 653 F.2d 180, 185–86 (5th Cir. 1981)).

**The Defendants**

8. The Regents of the University of Michigan ("the Regents") is a corporate entity, with the right to be sued, and is responsible for governing the University of Michigan, pursuant to Mich. Comp. Laws § 390.3 and § 390.4.

9. The Regents are the governing body of the University of Michigan ("UM").

10. The Regents are responsible for setting and approving all policy at UM, including sex discrimination, hazing, and disciplinary policies.

11. The University of Michigan ("the University") is a public university organized and existing under the laws of the State of Michigan.

12. The University has received, and continues to receive, funding from the State of Michigan, making it, among other reasons, subject to the laws of the State of Michigan.

13. The University has received, and continues to receive, federal funding that requires compliance with Title IX.

**Notice to the University of Michigan in 1980**

14. UM had notice of the risk of violent and sexualized hazing on the Men's Ice Hockey team at least as early as October 1980.

15. In October 1980, a 19-year-old named J.T. Todd left the Men's Ice Hockey Team after he and five other freshmen were "stripped, shaved, covered with jam, eggs and cologne and left outside in near-freezing weather for 90 minutes."[4] Todd was found outside his dormitory by a group of other students who helped bring him inside.

16. John Giordano was Head Coach of the Men's Ice Hockey Team at the time of the incident.

17. The 1980 hazing incident was widely reported in local newspapers.

18. The president of the University of Michigan, Harold Shapiro, issued a statement censoring the varsity hockey team for the hazing.[5]

---

[4] ESPN Outside the Lines, *Sports Hazing Incidents* (2002) https://a.espncdn.com/otl/hazing/list.html.

[5] https://www.thecrimson.com/article/1980/10/18/michigan-investigates-team-hazing-pann-arbor/.

19. Michigan Athletic Director Don Canham suspended three players: team captain Tim Manning, alternate captain John Blum, and senior left-wing Jeff Mars, for two games.

20. A few weeks after the hazing, a sophomore named Bruno Baseotto left the team to play in Calgary.

21. On information and belief, Coach Giordano forbade freshman hazing immediately following the 1980 hazing incident and there was no hazing in the hockey program during the 1981-82, 1982-83 and 1983-84 Seasons.

**Berenson Becomes Head Coach in 1984**

22. Red Berenson was the Head Coach of the Men's Ice Hockey program at the University of Michigan from 1984 to 2017.

23. Freshman hazing returned in the Fall of 1984 immediately at the outset of Berenson's tenure as Head Coach.

24. In the Fall of 1984, forced genital shaving resumed. Upperclassmen targeted freshmen on campus, either in the dorms or elsewhere, and physically tackled and restrained them as their pants were removed and their genitals were shaved where they were found.

25. Berenson knew these assaults were occurring outside Michigan Hockey facilities and intervened with upperclassmen, directing that the sexual assault rituals should take place within the privacy of the Michigan Hockey facilities.

26. The sexual assault rituals that continued in subsequent seasons took place within the Michigan Hockey locker room and/or the visitor's locker room at Yost Arena, as directed by Berenson

27. For a period of 15 years, from the 1984-85 season through the 1998-99 season, Freshman initiation involved the shaving of all genital hair from above and around the penis, scrotum, between the scrotum and anus, and around the anus; other parts of the body were shaved as well, but with less consistency, including the armpits, legs, chest, back, etc.

28. During that time, some players experienced a "shocker" during the shaving, which was the quick insertion of the handle end of a disposable razor into a freshman's anus.

29. During some years, hazing included tying a string or rope around a player's penis that was tied off on the other end to a hockey helmet or bucket; the helmet or bucket would then be thrown over a ceiling pipe and upperclassmen would throw hockey pucks into the helmet or bucket, causing the string/rope to pull on the Freshman's penis; the upperclassmen would count the number of pucks they could get in the helmet before the string/rope snapped or disconnected.

30. In 1990, Congress passed the Clery Act, which required universities receiving Title IV federal student aid programs under the Higher Education Act to

report campus safety information, including all alleged criminal incidents on campus, including sexual assault.

31. Coaching staff, including all UM Hockey Officials, were mandatory reporters under the Clery Act and Title IX.

32. On information and belief, despite the fact that sexual abuse was occurring in the hockey program and known to all hockey coaches, the abuse was never reported under the Clery Act.

33. Men's Ice Hockey coaching staff exhibited no awareness of their reporting obligations under Title IX or the Clery Act and never reported the sexualized hazing for these federal authorities.

34. Men's Ice Hockey coaching staff never reported the sexualized hazing to law enforcement at the local, state, or federal level.

35. The complete lack of reporting by the coaching staff demonstrates that UM maintained a policy, practice, and custom of indifference to sexual abuse in men's athletics programs and made inadequate or nonexistent efforts to train the coaching staff on their legal reporting duties.

36. In the 1990s, the sexual assaults took place on a day known as "Turkey Tuesday" after an early season Tuesday practice. Following practice on Turkey Tuesday, the freshmen were lined up naked just outside the Michigan Hockey locker

room. It was clear from the excitement expressed by the upperclassmen that this was a primary event in the initiation rituals.

37. In the Fall of 1993, when the freshmen were assembled naked in line outside the locker room, Coach Berenson approached the freshmen with a smirk and asked one of them: “Hey [John Doe], what’s going on? Is this a birthday party?”

38. Red Berenson expressly condoned the genital shaving by directing players to shave “from the neck down” so that the results of the sexual assaults would be invisible when players were fully dressed.

39. Coaching staff were primarily former players hired after graduation.

40. As a result, some players experienced the hazing and then became staff members. Coaching staff were aware of the hazing that they themselves had experienced or participated in.

41. Some members of the coaching staff viewed the hazing as “a badge of honor.” As John Doe 5 recalled, around initiation time, he got “a smile and a wink” from certain coaches.

42. However, at the time they played for the University of Michigan Men’s Ice Hockey Team, Plaintiffs did not know that UM officials caused the hazing.

43. At the time they played for the UM Men’s Ice Hockey Team, the vast majority had no idea that Berenson and other hockey officials were facilitating the abuse and concealing their own role.

44. At the time they played for the UM Men's Ice Hockey Team, Plaintiffs were unaware, and could not have been aware, of the role of UM officials in causing the abuse, which included institutional failings, the policy, practice, and custom of deliberate indifference to sexualized hazing, and for some hockey officials, outright facilitation and direction of the terms of the abuse.

45. Further, at the time they played for the UM Men's Hockey Team, Plaintiffs did not know or understand that that they were experiencing sexual abuse, not merely hazing.

46. Young men often do not immediately recognize sexual abuse, particularly in athletic hazing.[6]

47. Coaching staff concealed the nature of the abuse and misled the players by referring to and treating the sexualized abuse as a form of team bonding, which caused the young members of the team to doubt their experiences and second-guess concerns that the abuse was wrongful or even illegal.

---

[6] *See, e.g.*, Petreca & Burgess, *Long-Term Psychological and Physiological Effects of Male Sexual Trauma*, JOURNAL OF THE AMERICAN ACADEMY OF PSYCHIATRY AND THE LAW (January 2024); Jeckell, A. S., Copenhaver, E. A., & Diamond, A. B., *The Spectrum of Hazing and Peer Sexual Abuse in Sports: A Current Perspective*. SPORTS HEALTH, 10(6), 558–564 (2018).

48. Coaching staff concealed the nature of the abuse and misled the players by chiding the few players who complained to "be a Michigan man"; that they were not being "good teammates"; and even penalizing players with reduced ice time.

49. Coaching staff made clear to players that participation in the sexualized abuse was a mandatory condition of playing hockey for Michigan.

50. With the abuse condoned, and in some cases mandated, by trusted adults, the young men relied on their coaches to understand what was happening to them and believe that it was normal.

51. Plaintiffs did not realize at the time of the hazing that they were being sexually abused in violation of their Title IX rights.

52. In September 2024, several former teammates began talking about their memories of the hazing.

53. Shortly after, one former player began to research the history of initiation practices in the Michigan Hockey program. In the course of his research, he discovered the hazing incident involving J.T. Todd in 1980 and began to realize the hazing was not isolated to a few years.

54. After discovering the hazing incident involving J.T. Todd, he realized that the University knew about the violent hazing as early as 1980 and that the University itself may have had a role in causing or condoning the continued hazing.

55. He shared this discovery with former teammates and began talking to others who had played for Michigan before and after him.

56. Over a course of months, the John Doe Plaintiffs began to exchange stories and compare their experiences.

57. Over a course of months, the John Doe Plaintiffs found they represented former Michigan hockey players from as early as 1984 and as late as 2001.

58. During these conversations in late 2024, the John Doe Plaintiffs who engaged in these conversations realized that what happened was not isolated misbehavior by their peers; rather, UM hockey officials had facilitated and concealed the abuse, that the University itself had caused the sexualized hazing through its knowledge and failure to respond reasonably.

59. During these conversations, the John Doe Plaintiffs who engaged in these discussions, now mature adults, realized that the hazing that occurred was in fact sexual abuse in violation of their rights under Title IX.

60. It was not until late in 2024, after they had exchanged information and stories with each other, that these John Doe Plaintiffs realized the extent to which Coach Berenson and other coaching staff had observed, verbally approved of, and instructed upperclassmen on the location and methods of the sexual hazing.

61. It was not until late in 2024, after they had exchanged information and stories with each other, that these John Doe Plaintiffs learned that the University of

Michigan and its leadership had caused the abuse by exposing them to a heightened risk of sexual abuse through its deliberate indifference to known past abuse.

62. Plaintiffs did not know and could not have known that Defendants permitted and facilitated the sexualized hazing over a period of decades until late in 2024, when they learned of the J.T. Todd incident; when they learned the extent of the coaching staff's involvement in the hazing at least as early as 1984; and when they learned that their experiences were not isolated incidents.

**John Doe 1**

63. During John Doe 1's freshmen year, he and the other initiates were taken to an upperclassman's house and held down while their genitals were shaved.

64. Members of the wrestling and football teams were in attendance witnessing and participating in his restraining while taunting him.

65. JD 1 experienced a racing heart and fear at the time of the incident.

66. JD 1 did not directly participate in the freshman hazing activities as an upperclassman.

67. JD 1 experienced academic challenges while attending Michigan following the hazing.

68. JD 1 still has vivid reoccurring flashbacks of the freshman hazing.

69. JD 1 suffered significant academic challenges during his years at Michigan following his hazing and was temporarily ineligible to play with the team.

70. These academic challenges caused by the impact of the sexual abuse damaged JD 1's career opportunities following his graduation from Michigan, including lost opportunities in professional hockey.

**John Doe 2**

71. When John Doe 2 was a freshman, his upperclassmen teammates held him down and shaved his genitals without any prior notice or warning.

72. Players on the wrestling and football teams were present during the hazing, participating in his restraining while taunting him.

73. The day following the freshman hazing, intense tension in the locker room between the freshman and upperclassmen escalated to a physical altercation.

74. The altercations resulted in several team meetings.

75. On information and belief, Red Berenson was aware of the freshman hazing incident and instructed the team to conduct hazing "behind closed doors."

76. JD 2 was present during future hazing activities but did not participate.

77. When JD 2 was an upperclassman, the hazing took place after practice and a staff member assisted to unlock the doors to the locker room.

78. Immediately following the freshman hazing, JD 2 began to engage in significant alcohol abuse, which intensified over time.

79. The alcohol abuse resulted in JD 2 seeking professional help after college and into his adult years.

**John Doe 3**

80. John Doe 3's recruitment to Michigan was led by Red Berenson and his primary Assistant Coach. The coaches attended JD 3's hockey games. Berenson made two home visits and offered JD 3 a full athletic scholarship. Berenson told JD 3 he was his top recruit and that he would build the freshman class around him.

81. JD 3 chose Michigan under Berenson's promise for professional hockey career development and progression.

82. During his freshman year at Michigan, JD 3 suffered the freshman hazing tradition. He was seventeen years old at the time.

83. The training staff arranged training tables in the locker room in preparation for the freshman hazing. Plastic razors sat on top of training tables as the freshmen entered.

84. The initiates were instructed to undress in their stalls while the upperclassmen called them in one at a time.

85. JD 3 was surrounded by all of his upperclassmen teammates.

86. The training and equipment staff was present and standing inside the door of the room during the hazing.

87. The upperclassmen took turns shaving the initiates. At one point during the hazing, four upperclassmen teammates together shaved JD 3's genitals, anus and other body parts.

88. JD 3 was subjected to taunting and humiliation about his physical appearance during the shaving.

89. JD 3 experienced cuts on his genitals and anus from the shaving. Upperclassman made taunting remarks about the cuts, stating the team would contract AIDS.

90. JD 3 experienced excessive bleeding for several days and was taunted for his injury.

91. JD 3 was anally penetrated by a razor blade handle in the course of the shaving.

92. JD 3 reacted aggressively to the anal penetration and attempted to initiate a physical altercation. The team captain instructed JD 3 to calm down and comply with the sexual hazing "like a Michigan man."

93. JD 3 refused to lay on the table and was pressured to comply by both freshmen and upperclassmen.

94. Right after the hazing, JD 3 walked past Equipment Manager Dave Marich. Marich taunted JD 3 about the hazing: "Not so tough now, are you? You're just one of the boys."

95. JD 3 became verbally aggressive with Marich, stating he would "kick his ass."

96. Marich informed the coaching staff about the interaction, and JD 3 was ordered by the coaching staff to apologize for his aggression.

97. JD 3 also complained to Trainer Rick Bancroft. Bancroft told JD 3 that it was part of the process and that JD 3 should do his best to get along with my new teammates. JD 3 asked, "How can I get along with them when they are shaving my balls and ass while humiliating me?" Bancroft responded that JD 3 "shouldn't rock the boat." He repeated the hazing rationale from other coaches and upperclassmen: "be a good teammate."

98. On information and belief, after JD 3 complained about the hazing to Marich and Bancroft, and after Marich relayed the complaint to other coaching staff, not a single member of the UM hockey staff attempted to investigate, report outside the hockey program, contact law enforcement, or take any corrective action to stop the sexual abuse.

99. During the evening initiation event, JD 3 was instructed to give a white T-Shirt to the training staff. The upperclassmen wrote slogans on the T-shirts and instructed the initiates to wear them. The training staff was present while the freshmen read their personalized slogan in front of the team.

100. The Coaching Staff occasionally entered the room to participate in the ridicule.

101. The initiates were instructed to wear Michigan Hockey helmets in preparation for the team party.

102. The initiates were given excessive amounts of alcohol, primarily whiskey and tequila.

103. Prior to this experience, JD 3 had rarely consumed alcohol. As noted, he was seventeen years old at the time of the initiation.

104. While inebriated, the initiates were asked a series of Michigan related trivia questions. If one initiate answered incorrectly, they were all required to take a shot of liquor.

105. The initiates were escorted to sorority housed and were greeted on the front porch by the sorority members. They were required to remove their helmets and read aloud their slogans.

106. Several initiates were excessively inebriated and began head butting cars with their hockey helmets.

107. The initiates were escorted to approximately six sorority houses.

108. JD 3 was inebriated and became lost on his way back to campus. He was found by an upperclassman's older brother across campus from the party.

109. JD 3 was continuously taunted by the equipment staff and was reprimanded by the coaching staff for voicing his frustration.

110. As a sophomore at Michigan, JD 3 was reprimanded by the captains and coaching staff for refusing to participate in freshmen hazing.

111. In his sophomore year, JD 3 complained to Coach Berenson and said he did not want to participate in hazing new freshmen. Berenson told JD 3 in response that some of the upper classmen did not like him, that he was not a good teammate, and that JD 3 thought he was better than his teammates.

112. Coach Berenson told JD 3 to be a "Michigan Man" and "a good teammate" to coerce him to participate in the abuse.

113. JD 3 then complained about the hazing to Berenson's primary Assistant Coach at the time, Mark Miller. Miller indicated that he respected JD 3's disdain for the initiation, yet informed JD 3 that he should comply in an effort to be a "good teammate."

114. On information and believe, no member of the UM hockey staff took any steps to investigate, report, or take any other corrective action to stop the sexual abuse after JD 3 complained about the hazing during his sophomore year.

115. As a result of the sexual hazing, JD 3 has dealt with sexual dysfunction and difficulty in intimate relationships.

116. JD 3 has chronically leaned on alcohol to help with sleep and reoccurring memories of his hazing.

117. The sexual hazing caused a significant damage to JD 3's hockey career and professional opportunities.

**John Doe 4**

118. During his freshman year at Michigan, John Doe 4 suffered freshman hazing.

119. JD 4 was asked by the upperclassmen to lay on a training table.

120. JD 4was held down while his genital area, underarms, and chest were shaved.

121. The upperclassmen initially used electric razors then switched to manual razors.

122. The upperclassmen shaving JD 4 shook his genitals and simultaneously taunted him.

123. While on the training table, upperclassmen rubbed his anus and scrotum with a lathered hockey stick.

124. The shaving occurred in the Yost Arena locker room.

125. Red Berenson, and his primary and secondary Assistant Coaches were in and around the locker room, shower room, and coaches' office during the hazing.

126. On Information and belief, the coaching staff was aware of the incidents taking place.

127. Red Berenson was in the shower when JD 4 entered the locker room after the shaving. JD 4 and Berenson had a brief, non-verbal interaction that involved Berenson smirking at JD 4.

128. During JD 4's freshman year, Coach Berenson called the team captains into his office to instruct the team which hazing experiences were acceptable and which were not.

129. During JD 4's freshman year, JD 4 participated in a hazing initiation party referred to as Trivia Night.

130. The initiates were required to wear a white T-Shirt with their names and humiliation slogan for easy identification.

131. The initiates were asked questions regarding past players. If the initiates answered incorrectly, they were required to take a shot of whiskey.

132. Kegs and hard liquor were supplied throughout Trivia Night.

133. Several initiates refused the alcohol and were given a non-alcoholic concoction to participate with equal suffering.

134. JD 4became inebriated during Trivia Night which resulted in physical altercations with other teammates.

135. JD 4 vomited outside the Trivia Night location.

136. JD 4's hockey performance suffered under the abusive team culture at Michigan.

137. Following his time at Michigan, JD 4 had difficulty establishing a career in professional hockey.

138. JD 4 engaged in self-destructive behavior during and since his years at Michigan and has struggled with substance abuse.

**John Doe 5**

139. In his last season of minor junior hockey, John Doe 5 received a phone call from Coach Berenson stating that he wanted him to join the Michigan Hockey Program for the following season.

140. JD 5 was given a partial scholarship that was to be reevaluated halfway through his freshman year.

141. Within the first 30 days of JD 5 joining the hockey team, he was subjected to the freshman initiation process.

142. During the freshman hazing activities, the members of the coaching staff were not directly present at the hazing activities; however, the coaching staff was in the building during the activities.

143. The shaving took place directly after practice in the visitor's locker room.

144. Upperclassmen directed the freshman athletes to strip down to their boxers in the visitor's locker room.

145. Upperclassmen then shaved their genitals.

146. It was clear that if a freshmen refused to accept abusive hazing, they would be ostracized and socially isolated from the team.

147. The upperclassmen who conducted the shaving taunted JD 5 about his genitals, asking him, "what is that thing?" and stating, "I'm not getting near that thing."

148. During his sophomore year, JD 5 observed other upperclassmen tie a 5-gallon bucket to the ceiling of the visitors' locker room and tie the other end of the hockey lace to the initiates' penises. Upperclassmen threw hockey pucks in the bucket to separate the scrotum from the penis shaft for the shaving portion of the hazing.

149. A Graduate Assistant entered the locker room during these hazing activities to provide support.

150. The upperclassmen held a Freshman Final Hazing celebration at a senior hockey player's residence. The team referred to it as "Trivia Night".

151. Each Freshman Hockey Player wore a white T-shirt with personalized nicknames/slogans.

152. The entire team participated in trivia questions that revolved around the sexual history of the former and current teammates. If a freshman did not answer the trivia questions correctly, they were required to take a shot of alcohol that was provided by the upperclassmen.

153. During JD 5's freshman initiation, all freshmen were present and each was provided with a handle of liquor.

154. Halfway through Trivia Night, each freshman had to swallow a live goldfish.

155. One of JD 5's Teammates fell ill during Trivia Night, vomiting the liquor and goldfish onto the floor.

156. When Trivia Night was complete, the upperclassmen placed hockey helmets onto the freshman and escorted them into the back of a teammate's vehicle.

157. They were driven to a house party.

158. During one of the Trivia Nights during his time at Michigan, JD 5 encountered a freshman teammate unconscious and in a state of alcohol-induced sleep apnea in the basement of the house.

159. JD 5 attempted to wake up the freshman and restart his breathing. Eventually, his teammate woke up. JD 5 went home only after the freshman was awake and breathing consistently.

**John Doe 6**

160. John Doe 6 committed to attend and play for Michigan on a full scholarship.

161. JD 6 was the #1 ranked recruit in his class, with significant potential to play professional hockey after graduation.

162. The Upperclassman taunted the freshmen about the coming initiation while keeping the details secret.

163. Initiation took place over a period of days, approximately two weeks after the start of JD 6's freshman year.

164. Within the first two weeks of the start of JD 6's freshman year, the initiates were asked to wear a plain white T-Shirt and to leave their dorms at a specific time.

165. JD 6 was forced to drink a live goldfish.

166. The freshman were later transported to another house for the main initiation party.

167. Initiates were required to participate in the hazing to be accepted onto the team.

168. Upperclassmen taunted his physical appearance during the hazing.

169. JD 6 was forced to drink a dangerous amount of alcohol at the main initiation party. The following morning, the initiates were required to attend the Team Picnic. JD 6 struggled to stand and participate at the event.

170. Initiation included genital shaving. On another evening, after practice, the upperclassmen shaved JD 6's genitals in the locker room.

171. The coaching staff were near the locker room during the freshman shaving activities.

172. After the abusive hazing, JD 6 had difficulty sleeping and his confidence on the ice suffered.

173. During JD 6's freshman year, his athletic performance declined and his career prospects in hockey changed dramatically.

174. JD 6 worked with a sports psychologist during his time on the hockey team.

175. After graduating, JD 6 was drafted to an NHL team but they ultimately declined to sign him.

176. Instead, JD 6 played a few games with their minor league team.

177. JD 6 pursued another career instead of professional hockey.

178. JD 6 worked with a psychologist in his adult life.

179. The personal and psychological impact of his experience on the hockey team also damaged JD 6's professional career in the business community.

**John Doe 7**

180. John Doe 7 played junior hockey before attending the University of Michigan.

181. JD 7 was recruited to the Program by Red Berenson directly. Red Berenson personally discussed the opportunities associated with playing on Michigan Hockey during a recruiting trip, prompting JD 7 to commit to the Program.

182. During his recruiting visit, JD 7 was treated with respect by the coaching staff and the active players.

183. JD 7 felt comfortable with Michigan, the staff, and the players, and believed it was a tremendous opportunity to accept.

184. Once he arrived at Michigan, the initiates were aware of the hazing activities and were told the activities would bring them closer together as team.

185. At the start of initiation, the hazing took place in an area adjacent to the Home Locker Room.

186. The freshmen were told to remove their clothing and prepare for shaving.

187. The locker room was set up with team training tables to which each initiate took turns laying on the table.

188. Several upperclassmen began shaving JD 7's arms, legs, chest, anus, and genitals with razors.

189. An upperclassman used a blowtorch to taunt JD 7 while he was lying on the table.

190. JD 7 had his genitals handled and pulled as the upperclassmen singed his public hair with the blowtorch.

191. JD 7 was cut on his legs and genital area by the razors.

192. During initiation, the upperclassmen hung a helmet over one of the pipes and tied it to skate laces. The helmet had several pucks inside it. As the freshman were waiting to be shaved, upperclassmen coerced the initiates to tie their genitals to the string to test the number of pucks they could withstand.

193. JD 7 and his freshmen teammates were forced to wear women's nylons and were blindfolded before they were placed into a vehicle.

194. The initiates were transported to a sorority and paraded around in front of the sorority members. The nylons allowed clear visibility of their genitals.

195. The initiates were later transported to a teammate's house for the remainder of initiation night.

196. The upperclassmen placed the initiates around a table, removed their blindfolds, and placed varying character masks on them.

197. The initiates had their bodies and nylons painted in different colors.

198. The initiates were asked a series of trivia questions about former Michigan Hockey players and were required to takes shots of alcohol if they answered the trivia questions incorrectly.

199. JD 7 did not consume shots of liquor, but was given beer by the upperclassmen.

200. JD 7 blacked out after consuming multiple cups of beer.

201. JD 7 woke up in an unfamiliar bedroom and began to panic, screaming "no, no, no," when his teammates entered the room.

202. JD 7 was heavily inebriated and lost his ability to walk and stand upright.

203. JD 7 woke up the following morning in his dorm wearing the nylons from initiation.

204. The freshmen were required to participate in all hazing activities in order to be accepted as part of the team.

205. The sophomore class was expected to take on larger roles during initiation, but JD 7 did not directly participate in his sophomore year.

206. When he was a sophomore, JD 7 declined offers to handle the blowtorch or the razors during the freshman hazing.

**John Doe 8**

207. JD 8 suffered the freshman initiation of genital shaving.

208. JD 8 and his teammates understood that "Red's practice was to shave you from the neck down," so no one would notice.

209. The location of the shaving was directed or expressly condoned by Red Berenson.

210. Approximately seven or eight teammates performed the shaving.

211. JD 8 was directed by upperclassmen to get on a table "on all fours." Upperclassmen shaved his entire genital area.

212. JD 8 was anally penetrated by the handle of a shaving razor in the course of the shaving.

213. After the shaving, teammates put initiates into a van in their boxers and drove them to a sorority house.

214. Hazing took place during the week because the team played on weekends.

215. More typical hazing occurred at the sorority house, primarily through forced drinking that led to vomiting and blacking out.

216. Initiates were required to swallow a goldfish.

217. The Equipment Manager and Athletic Trainer at the time were aware of and present at the sexualized hazing.

**John Doe 9**

218. During his freshman year at Michigan, John Doe 9 and the other freshmen were made aware they would be subjected to a form of hazing. The exact activity was intentionally secret.

219. The upperclassmen continuously taunted the freshman prior to the hazing activities.

220. The entirety of freshman initiation lasted approximately one week and consisted of several events that took place at Yost Ice Arena and off-campus.

221. On the day of freshman hazing, two training tables were placed in the locker room in preparation for shaving.

222. On information and belief, the coaching staff was aware initiation was taking place after practice. The coaching staff left the building immediately after practice ended.

223. The training and equipment staff were present in the building to supervise the freshman hazing activities. They were not directly involved in shaving the initiates.

224. Upperclassmen handled and shaved JD 9's genitals.

225. JD 9 was the last of eight initiates to be shaved. The upperclassmen reused the razors to shave the initiates.

226. JD 9 was concerned that he might contract HIV during the hazing process.

227. Each initiate was instructed to lay on the training table one at a time. Upperclassmen lathered their genital area with shaving cream.

228. JD 9 experienced cuts on his legs when the upperclassman had completed the shaving.

229. During the shaving process, an upperclassman singed JD 9's pubic hair with a blow torch. A towel was used to dampen the flame.

230. JD 9 was instructed to kneel on his hands and knees on the training table. An upperclassman slightly inserted the razor blade handle into his anus.

231. The entire Michigan Hockey team as well as the equipment staff were present during the freshman shaving.

232. The initiates were each given Vaseline to relieve discomfort during practice after the shaving.

233. At the end of initiation week, a private party was held at an upperclassmen house.

234. The initiates were required to finish an entire bottle of liquor during this private party. They were only allowed to stop if they became unconscious.

235. Upperclassman threw eggs at the freshman and instructed them to sing the Michigan fight song at several on-campus locations.

236. The initiates and teammates that experienced discomfort in the activities were fearful to speak up against the initiation practices.

237. JD 9 did not share this experience with family or friends during his time on the team in fear of retaliation from the Michigan Hockey Staff.

**John Doe 10**

238. The Michigan Hockey Coaching staff watched John Doe 10 play minor hockey several times in his recruitment and invited him for an official visit.

239. JD 10 attended the official visit and accepted a full scholarship to play for Michigan.

240. As a freshman, JD 10 was held down naked on a training table in a room off of the locker room in preparation for the freshman hazing. He was held down by upperclassmen.

241. Upperclassmen used a blowtorch to singe his pubic hair.

242. JD 10 was shaved from the neck down with plastic disposable razors. The upperclassmen did not use shaving cream.

243. Upperclassmen handled his genitals as they conducted the shaving.

244. JD 10 was forced to kneel on his hands and knees as upperclassmen shaved inside and around his anus.

245. Someone pressed the handle of a razor blade against JD 10's anus.

246. The entire hockey team was present and witnessed the hazing activity.

247. The Coaching staff was in the locker room adjacent to where the hazing took place.

248. The equipment manager and the medical trainer were in the trainer's room while the hazing was taking place.

249. After the shaving, JD 10 was held down as an upperclassman tied a skate lace around his penis and tied the opposite end to a hockey helmet. The upperclassman hung the hockey helmet over a pipe in the ceiling and began throwing pucks into the helmet.

250. The pucks caused the helmet to lift JD 10's penis, causing rope burn and soreness.

251. Afterwards, the freshmen attended a house party thrown by the upperclassmen. They were forced to remove their clothing, drop their underwear to their ankles, and sing the Michigan Fight Song on the porch, exposing their genitals to everyone at the party. This caused deep embarrassment and humiliation.

252. The initiates were blindfolded and forced to drink while driven around in the back of a van. They were driven to an upperclassmen house and escorted to the basement.

253. The initiates participated in an activity referred to as Trivia Night. If the initiates answered the questions incorrectly, they were required to take shots of liquor that included a live goldfish. The questions were designed for the initiates to not know the answer.

254. JD 10 swallowed approximately five goldfish.

255. As another hazing activity, the initiates were to sing the Michigan Fight Song in a public venue while wearing only bikini briefs.

256. JD 10 suffered from body image issues and expressed his discomfort about the upcoming hazing practice to the upperclassmen. The initiates were still required to participate, yet were allowed to wear boxer briefs rather than bikini briefs.

257. JD 10 experienced significant discomfort and anxiety during the initiation.

258. JD 10 experienced cuts and razor burn following the shaving.

259. JD 10 applied Vaseline on his razor burn prior to playing due to severe irritation while sweating and wearing equipment.

260. JD 10 did not share this experience with family or friends until many years later.

**John Doe 11**

261. Before Michigan, John Doe 11 played hockey for several high-level minor hockey teams.

262. JD 11 was recruited to the Michigan Hockey Program.

263. As a freshman, JD 11 suffered both sexual and non-sexual hazing.

264. During his freshman year, JD 11's genitals were shaved and handled by upperclassmen teammates.

265. JD 11 experienced taunting and ridicule of his physical appearance while being shaved.

266. Coaching staff were not present at the time of the hazing.

267. On information and belief, the Equipment Manager Ian Hume was present in the building during the time of the hazing.

268. The initiates were forced to consume excessive amounts of alcohol. Several initiates vomited and became unconscious.

269. At the time of the hazing, JD 11 felt pressure from his teammates to participate. He was led to believe there was no opt-out option.

270. On information and belief, the coaching staff was aware of the freshman hazing practices.

271. JD 11 experiences reoccurring flashbacks and memories of the taunting he endured during the sexual hazing.

272. JD 11 experienced feelings of shame and self-image issues following the sexual hazing and forced public exposure.

273. The freshman hazing activities impacted JD 11's ability to pursue intimate and romantic relationships due to resulting lack of confidence. This persisted during and after his tenure on the Michigan Hockey team.

**John Doe 12**

274. John Doe 12 was the #1 ranked recruit in the United States when he graduated from high school. He received offers from top hockey programs across the country.

275. JD 12 was subjected to the shaving initiation. It was conducted in the visiting team's locker room.

276. Training staff provided tables, shaving cream, and Vaseline for the shaving.

277. JD 12 was blindfolded, naked, and taped down to a table. He was surrounded by upperclassmen. They shaved his chest, legs, arms, genitals, buttocks, and anus. He suffered multiple cuts and bleeding from the rough shaving.

278. The handle end of a razor was inserted into his anus while other laughed. They used Vaseline to insert the razor. This was known as "the shocker."

279. Head Trainer Rick Bancroft and other training staff were in the room during the shaving. They laughed out loud at the scene. It was extremely disturbing to JD 12 that hockey staff were encouraging the abuse. He could hear members of the training staff laughing throughout the ordeal.

280. After the shaving, he and the other freshmen were pushed into a van in their underwear. JD 12 was bleeding from his genitals.

281. Initiation continued, with significant binge drinking. JD 12 was shocked by the drinking. JD 12 had never had a drink before because he was focused on being an athlete and working towards playing in the NHL. It was extremely disturbing to JD 12 to lose control over his body and have no ability to refuse the forced drinking.

282. He reasonably believed that refusal to participate in any of the initiation would hurt his prospects on the team and risk compromising his time on the ice.

283. JD 12 did not report the abuse to anyone because he was afraid of retaliation.

284. As another part of the initiation, JD 12 and other freshmen were taken to a basement. They were forced to binge drink beer and liquor and engage in an “elephant walk,” in which he and his classmates held each other’s genitals while walking around the basement.

285. JD 12 was forced to eat a goldfish.

286. As an upperclassman, JD 12 refused to participate in shaving new freshmen. He also refused to participate in the forced drinking.

287. As an upperclassman, Berenson and other coaching staff instructed upperclassmen which weekend was best to plan the shaving initiation.

288. JD 12 joined the Michigan hockey program as a confident and outgoing young man. After the hazing experience, he experienced significant anxiety, as if "the bottom could fall out at any moment." He feared that sexual abuse could occur again at any time throughout his time on the hockey team.

289. After the abuse, JD 12 developed significant anxiety and depression, which has continued throughout his adult life.

290. While JD 12 had joined the team as someone who did not drink alcohol, he began to drink heavily and has struggled with alcohol use throughout his life.

291. The impact of the sexual abuse has damaged JD 12's personal and romantic relationships, including sexual dysfunction and difficulty maintaining stable relationships.

292. JD 12 continues to feel shame, guilt and failure related to what happened, particularly that he did not protect his teammates.

293. The impact of the abuse damaged JD 12's educational and professional opportunities. When he joined Michigan, he was a top recruit in the country. After Michigan, he played minor league hockey for approximately six years and was called up for a very limited number of NHL games.

**John Doe 13**

294. John Doe 13 was subjected to initiation into the Michigan Men's Ice Hockey team over the course of several days.

295. Upperclassmen blindfolded JD 13 and other initiates and drove them to multiple sorority houses in their underwear.

296. Upperclassmen invited the sorority members to look in the initiate's underwear and remove their underwear.

297. Upperclassmen quizzed initiates about penis size and number of sexual partners.

298. Upperclassmen drove initiates to the basement of someone's house and ordered initiates to sit in a circle. Upperclassmen poured water on the freshmen with fans pointed on them to keep them extremely cold.

299. Initiates tried to help keep each other warm by rubbing each other's backs and flicking water off of each other.

300. Upperclassmen directed the initiates that they had to finish an entire keg of beer before they could get up.

301. Afterwards, upperclassmen brought the initiates upstairs and required them to do 12 shots. In the middle of the shots, they were required to eat live goldfish.

302. The upperclassmen arranged trash cans around the room for vomit.

303. After being forced to swallow the goldfish, several of the freshman initiates vomited into the trash cans.

304. JD 13 did not initially vomit after ingesting the goldfish, but later vomited after falling unconscious.

305. JD 13 was later informed by his teammates that he projectile vomited throughout the room. His teammates placed JD 13 into a cold shower where he proceeded to fall sleep. JD 13 woke up the next morning with vomit in his bed.

306. The following day, JD 13 could not swallow food or vitamins because it elicited a familiar sensation as to when he swallowed the goldfish. This reaction lasted

several days before JD 13 could swallow pills without eliciting a gag response and vomiting.

307. During "Trivia Night," The initiates were made to read slogans which rhymed with their name in a sexual nature. JD 13's slogan was demeaning and distressing for him to read out loud.

308. JD 13 initially refused to read his slogan out loud and was, in turn, stricken by several teammates wearing heavy rings.

309. In the course of the hazing, JD 13 and the freshman initiates were blindfolded and led to the river.

310. The upperclassman asked the initiates to come forward and "take one for the team" and jump into river.

311. JD 13 experienced feelings of severe anxiety and panic as he considered himself a poor swimmer.

312. JD 13 was ridiculed by his upperclassmen teammates for not "being there for his teammates." JD reluctantly raised his hand before the event concluded, yet he as not made to jump.

313. JD 13 did not discover they were throwing boulders into the lake until after the initiation events had concluded.

314. Genital shaving was the "main event" on the final night of initiation.

315. Initiates reported to an upperclassman's house, where the detached garage was set up for the event with two long tables.

316. Upperclassmen directed initiates two at a time to strip and lay down on the tables.

317. Each time, multiple upperclassmen surrounded the table and started shaving them without shaving cream.

318. Some upperclassmen joked that the purpose was to cause razor burn, which would be extremely uncomfortable under hockey equipment.

319. Upperclassmen handled JD 13's penis and testicles while taunting him.

320. JD 13 could hear others encouraging the shaving, telling them to "really get in there."

321. Upperclassmen told JD 13 to "spread 'em" as several upperclassmen simultaneously shaved his arms, legs, hands, fingers, feet, toes, torso, shoulders, penis, testicles, and perineum.

322. Upperclassmen then directed JD 13 to get on "all fours."

323. Multiple teammates then took turns spreading his buttocks and shaving near his anus and perineum.

324. JD 13 again heard directions from upperclassmen to "really get in there."

325. The garage door was kept open throughout the shaving.

326. JD 13 was conscious that neighbors could see and even photograph them while they were being shaved.

327. Later, as an upperclassman, JD 13 felt that he was obligated to participate in the shaving for freshmen He did not touch or shave any player's genitals.

328. After graduating from Michigan, JD 13 played minor league professional hockey briefly.

329. JD 13 suffers flashbacks and unwanted memories of the sexual hazing.

330. JD 13 suffers persistent feelings of guilt and confusion about the sexual hazing.

**John Doe 14**

331. JD 14 was heavily recruited by the Michigan coaching staff from a minor hockey team.

332. During the initiation week, John Doe 14 and other freshmen were forced to drink dangerous amounts of alcohol and repeatedly blindfolded.

333. During the initiation week, while John Doe 14 was blindfolded, multiple upperclassmen flicked the tip of his penis repeatedly. This occurred repeatedly over the course of the initiation period and was not confined to the shaving incident.

334. On one night, they were taken from practice in their boxer shorts, blindfolded, loaded into a utility van and driven around Ann Arbor to various sorority houses where they were quizzed and directed to do whatever the sorority sisters instructed.

335. On another night, upperclassmen blindfolded the freshmen in their underwear and escorted them down to a basement in their underwear. The upperclassmen proceeded to pour water on the initiates and placed fans in their direction to make them extremely cold so that they had to huddle together.

336. JD 14 and the initiates were forced to drink alcohol and swallow a live goldfish until they vomited.

337. On "Turkey Tuesday," in the locker room, John Doe 14 was forced to strip naked. He was surrounded by a group of upperclassmen.

338. Upperclassmen used a blow torch to burn off his pubic hair.

339. Upperclassmen then shaved his penis, testicles, and anus. Some shaving was done with shaving cream and other shaving was dry.

340. The end of a razor handle was inserted into JD 14's anus.

341. During the initiation, upperclassmen simulated sex and humped the freshmen, rubbing their genitals on them through their clothes.

342. The upperclassman mocked JD 14's physical appearance during the shaving.

343. The upperclassmen shaving JD 14 continued to flick his penis throughout the ordeal.

344. The coaching staff was not present in the locker room during the hazing, but they were present in the building.

345. For several weeks after the hazing, JD 14 experienced heart palpitations and insomnia.

346. As an upperclassman, JD 14 participated in both the sexual and non-sexual activities during the freshman initiation.

347. JD 14 experiences persistent feeling of shame, guilt and failure as a result.

348. Afterwards, athletic trainer Rick Bancroft discussed the initiation activities with the upperclassmen and joked about it with them.

349. JD 14 began to struggle with substance abuse following the freshman initiation, including alcohol and drug use.

350. After college, the impact of the abuse, including JD 14's substance use, significantly damaged his career opportunities.

351. After college, JD 14 briefly played minor league hockey.

352. Years later, JD 14 was eventually hospitalized and completed treatment for substance use. JD 14 continues to experience flashbacks, unwanted memories, and vivid nightmares of the abuse to this day.

## John Doe 15

353. John Doe 15 was recruited by Red Berenson and Mel Pearson. The coaching staff touted the brotherhood, academic excellence and career opportunities associated with the Michigan Hockey Program.

354. JD 15 accepted the offer from Michigan.

355. JD 15 attended his official program visit at 17 years old, during which he was subjected to substantial drinking and abuse.

356. On his official visit, JD 15 was forced to binge drink and was instructed that certain women were going to engage in sex with him. This was completely unwanted and JD 15 was afraid and nervous. He woke up naked, covered in vomit, in an upperclassman’s home, with an intense sense of violation.

357. JD 15 cooperated with the abusive treatment during his recruiting trip in order to protect his place on the team and so that he would not be deemed as weak by other players.

358. The morning after, JD 15 was transported to the airport by Assistant Coach Billy Powers.

359. JD 15 felt sick and confused by the recruiting visit.

360. During his freshman year, JD 15 was subjected to multiple incidents of further abuse.

361. JD 15 held down by several upperclassman teammates while they rubbed Ben-Gay, Icy Hot, or hot sauce on his body, including his genitals.

362. Upperclassmen shaved JD 15's genitals.

363. The upperclassmen routinely made threats of anal penetration of freshmen who did not comply with the shaving.

364. JD 15 was subjected to constant taunting of his physical appearance.

365. JD 15 experienced intense burning in his genital area as a result of the hazing.

366. During another hazing incident, JD 15 was removed from his dorm, blindfolded and escorted in a van to an upperclassman's house. The upperclassman intentionally drove the initiates around recklessly, causing the initiates to be disoriented and bruised as they were slammed against the inside of the car.

367. JD 15 was required to participate in "rookie shows" where the initiates were forced to perform humiliating acts for their amusement.

368. The initiates were paraded around the house while bystanders handled their genitals and inserted their fingers into their anuses.

369. The initiates were placed in the basement and forced to listen to disorienting music.

370. Upperclassmen simulated raping the initiates, humping and laughing at them.

371. The initiates were pelted with eggs by their teammates, thrown like fastballs. JD 15 and his freshmen teammates later used tweezers to remove the eggshells from their skin.

372. The initiates were required to lay naked on the ground with another freshman naked above them. They poured beer into the other initiate's mouth, forcing him to swallow the alcohol that ran over the other freshman's naked body and anus, known as the "D to D butt chug." If the initiates vomited, they were forced to repeat the activity.

373. The initiates were ordered to sit around a table known as the "Barf Table."

374. The initiates were forced to take shots of whiskey that included a live goldfish.

375. The upperclassmen placed bets on which freshman would go the longest without vomiting.

376. Several initiates vomited the goldfish.

377. The initiates were transported to another location that included a house party. Several other athletes and women were in attendance, participating in the taunting and cheering.

378. The initiates were forced to participate in an event titled the "crawl."

379. During the crawl, the initiates were required to kneel, naked, on hands and knees between legs of the entire team while being smacked with force leaving handprint welts.

380. Upperclassmen wore heavy rings to maximize the pain and injury as they assaulted the freshmen.

381. JD 15 was unable to voice his discomfort under the threat that the hazing would continue or intensify if he resisted.

382. JD 15 experienced visible welts, bruises, and chemical burns on his genitals, and cuts and lumps on his scalp from the rings.

383. The following morning, practice was run by the team captains who initiated the hazing.

384. During that practice, Red Berenson and Assistant Coach Billy Powers sat in the stands laughing at the freshman vomiting on the ice.

385. The struggling freshmen were later scolded by Berenson and Powers for their subpar practice performance.

386. After initiation week, fed up with continuing verbal abuse from the upperclassmen, JD 15 fought one of the captains on the ice during practice.

387. JD 15 was required to meet with the coaches after the incident. JD 15 told them it was a carryover from the hazing. In response, Red Berenson and Billy

Powers both stated, "Your teammates don't like you. You're not being a good teammate."

388. During the meeting, Berenson implied that JD 15's scholarship was at risk if he did not improve his "shitty attitude."

389. Berenson's primary Assistant Coach, Mel Pearson, admitted privately to JD 155 that he was aware the hazing was taking place, and referred to it as "awful traditions."

390. Pearson instructed JD 15 to "just get through it."

391. JD 15 continued to experience severe anxiety before practice or when interacting with teammates.

392. JD 15 experienced a chronic racing heart rate, nausea, stress and anxiety, as well as sleeplessness.

393. While he was still a student at Michigan, JD 15 was prescribed Zoloft, Celexa, Klonopin to address his emotional and psychological distress.

394. JD 15's academic performance suffered as he struggled with the fallout from the hazing.

395. JD 15 had arrived at Michigan as a confident, happy 17-year-old, and left in a traumatized, angry, and depressed state.

396. JD 15 continued to struggle to regain his academic and athletic performance. After attempting to salvage a college hockey career, JD 15 withdrew and did not complete his college degree.

397. After his college hockey career ended, his NHL potential was gone.

398. JD 15 has suffered from long-term sexual dysfunction and difficulty in intimate relationships, with intimacy triggering paralyzing flashbacks of being held down and abused.

399. JD 15's distress intensified and resulted in a series of criminal charges following his time at Michigan.

400. JD 15 suffered from alcohol and drug abuse following his time at Michigan.

401. JD 15 has continued to suffer depression, anxiety, nightmares, and symptoms of PTSD throughout his life since leaving Michigan.

**John Doe 16**

402. After achieving great success in junior hockey and being recruited to Michigan, John Doe 16 accepted a full athletic scholarship to the University of Michigan.

403. The Michigan Hockey Program was regarded as a top program in college hockey at the time.

404. During the fall of his freshman year, JD 16 and the other freshman initiates were ordered to report to the senior athletes' house.

405. The initiates were blindfolded and instructed to climb into a van driven by an upperclassman.

406. The initiates were driven around in silence for approximately 30 minutes. The initiates were not aware of the destination.

407. The initiates were led out of the van in single file, standing with their hands on the shoulders of the player in front.

408. The upperclassmen guided the initiates to the riverbank and instructed them to sit. The initiates were called forward one by one.

409. While the freshmen were blindfolded and waiting their turn, upperclassmen threw boulders in the water to make it sound like other teammates were being thrown into the river. Upperclassmen called out, "look at him trying to swim!" and other phrases that caused the freshmen to believe someone might be drowning. JD 16 experienced genuine terror and fear that he and others could drown.

410. When it was JD 16's turn, an upperclassman pushed JD 16 toward the edge of the water. They stopped JD 20 before he entered the water and sat him down again. An upperclassman instructed him to stay quiet as they threw large rocks into the river to mimic bodies splashing.

411. During another hazing activity, JD 16 was ordered to report to the seniors' house, was blindfolded, and instructed to fully undress.

412. Approximately 15 upperclassmen were present.

413. The initiates walked single file, hands on the shoulders of the player in front, and loaded into a truck.

414. The initiates were driven around for approximately 15 minutes, ordered to not speak, look up, or raise their heads. When the truck stopped, they were led inside a sorority house.

415. The initiates were ordered to dance inside a sorority house while sustaining taunting from unknown personnel witnessing the event.

416. JD 16 was stripped naked and made to stand in a dark, nearly black-lit room.

417. Upperclassman observed while consuming alcohol.

418. JD 16 was exposed for approximately ten minutes while being questioned.

419. JD 16 was unable to voice opposition out of fear of targeting or further punishment.

420. JD 16 was blindfolded and forced to wear diapers. He was subjected to continuous taunting.

421. The initiates were threatened if they spoke or moved.

422. The upperclassmen referred to the activities as "tradition" at Michigan Hockey.

423. The initiates sat in a dark room for approximately one hour.

424. Every 10–15 minutes a pitcher of beer was brought in, and the initiates were ordered to drink it within minutes.

425. Approximately 15 upperclassmen were present and asked them a series of questions. If an initiate spoke or answered incorrectly, they were required to take a shot of hard liquor.

426. Initiates were allowed to exit participation if they vomited.

427. JD16 consumed approximately ten shots in rapid succession.

428. When JD 16 answered a question wrong, an upperclassman handed him a live goldfish and directed him to chew and eat it. JD 16 loved animals and was extremely disturbed by being forced to crush the fish alive.

429. JD 16 vomited blood and bile immediately following the initiation activity. He continued to vomit throughout the night and believed he might die from alcohol poisoning.

430. JD 16 was also subjected to genital shaving by the upperclassmen.

431. When JD 16 tried to protest, upperclassmen threatened him with exclusion or further humiliation.

432. JD 16 experienced difficulty sleeping and had recurring nightmares following this event and socially withdrew from the team.

433. Following the initiation event, JD 16 socially isolated and avoided team showers whenever possible.

434. JD 16's academic and athletic performance began to decline sharply after the abuse.

435. During JD 16's sophomore year at Michigan, upperclassmen instructed JD 16 and other players to participate in the freshman hazing at an off-campus residence. Upperclassmen stated that it was now JD 16's turn to initiate the freshmen.

436. JD 16 expressed his discomfort and unwillingness to shave the freshman. The upperclassmen responded to his opposition with pressure and anger.

437. JD 16 was ordered to strip the freshmen naked and shave them.

438. Multiple sophomores were present. Upperclassmen targeted JD 16's direct involvement.

439. In response to the intense pressure from the upperclassmen, JD 16 touched his teammates' genitals and anuses against his will.

440. JD 16 attempted to end his participation early, but upperclassmen stopped him and repeatedly stated he was not done yet.

441. Two freshmen that JD 16 shaved never spoke to him in the same way after the initiation. JD 16 understood that their relationship was permanently ruptured.

442. During the shaving, an exterior door the off-campus house was kept open during the initiation ritual. The upperclassmen refused JD 16's request to close the door. The hazing was visible through the open door to pedestrians outside the house.

443. JD 16 approached the University's then-Athletic Director the hazing activities.

444. JD 16 described his "initiation" experience and relayed his emotional distress directly to the Athletic Director.

445. The Athletic Director informed JD 16's Head Coach, Red Berenson, of the conversation without JD 16's request or consent.

446. Immediately after Berenson was informed of JD 16's complaints to the Athletic Director, Berenson cut JD 16's playing time drastically for the remainder of his time at Michigan.

447. Throughout his time on the team, JD 16 heard other players recite phrases that justified the hazing activities. These phrases included: "This is what Wolverines do," "It's tradition," and "Every class before you went through this."

448. Berenson's primary Assistant Coach, Mel Pearson, made comments to the freshmen alluding to his awareness of the hazing.

449. No meetings were held to discourage hazing regardless of the open conversation held by upperclassmen.

450. On information and belief, neither the Athletic Director nor Head Coach Berenson took any action to investigate, report, or take any other corrective action to stop the sexual abuse.

451. Instead, Berenson retaliated for reporting the abuse by cutting JD 16's playing time.

452. Following the hazing incidents, JD 16's academic and athletic performance declined sharply.

453. After the hazing, JD 16 suffered from persistent insomnia and recurring nightmares, often severely interfering with his sleep.

454. What began as acute symptoms for JD 16—shaking, racing heart, nausea, and insomnia—evolved into chronic anxiety and recurrent stress responses that continue to this day.

455. JD 16 continues to have reoccurring nightmares approximately twice a month.

456. JD 16 also experienced a chronic loss of appetite following the goldfish incident.

457. JD 16 suffered from sexual dysfunction following his forced participation in hazing the next group of freshmen.

458. JD 16 has not shared his hazing experience with friends or family members out of shame and guilt for his involvement.

459. JD 16 suffered a negative impact on his hockey career, loss of educational opportunities and long-term earning potential due to his hazing, his reporting of the hazing to the Athletic Director and the subsequent retaliation by Berenson.

460. While JD 16 had joined Michigan as one of the top hockey recruits in North America, after the hazing and the University's response to his complaints, JD 16's hockey trajectory was dramatically changed.

461. JD 16 also lost the educational and career opportunities that would have been available to him as a student athlete at the University of Michigan.

462. As a result, JD 16 and his family suffered significant financial strain following their life-long dedication to the progression of his hockey career.

**Berenson Publicly Announces End to Freshman Hazing in 2012**

463. In 2012, Berenson announced the end of "freshman hazing."

464. Berenson publicly acknowledged only the tame traditions of requiring freshmen to load equipment and to eat last.[7]

465. But Berenson also vaguely acknowledged instances of more extreme hazing, noting that "[w]e've had captains that got too carried away, and they forgot what they're supposed to do."[8]

466. Based on the hazing his freshman players actually experienced from 1984 through 1999, Berenson in fact knew of and maintained control over a systematic ritual of sexual hazing during his coaching tenure that was neither "tame" nor the result of "captains that got too carried away."

467. The hazing described by the Plaintiffs in this Complaint is exponentially more egregious than the hazing Berenson suggested to the press in 2012.

468. He knew of the hazing at all times and could have stopped the sexual abuse at any time before 2012.

469. Instead, he had knowingly accepted and facilitated the abuse.

---

[7] The Ann Arbor News, *Red Berenson eliminates hazing of freshmen from Michigan hockey program*, https://www.annarbor.com/sports/red-berenson-eliminates-freshman-hazing-from-michigan-hockey-program/ (Oct. 5, 2012).

[8] The Michigan Daily, *With captains help*, *Berenson eliminates freshman hazing*, https://www.michigandaily.com/uncategorized/berenson-eliminates-freshman-hazing-captains-help/ (Oct. 4, 2012).

**<u>The Role of the University of Michigan and Board of Regents</u>**

470. Enduring sexual abuse was required to be a member of the Michigan Men's Ice Hockey team during this time period.

471. In addition to Berenson's role, many of his longtime coaching staff also facilitated the abuse.

472. Both Berenson and certain longtime coaching staff retaliated against players who complained or reported the abuse by cutting their ice time and by interfering with their professional hockey prospects.

473. Defendants University of Michigan and the Board of Regents conducted no inquiries or investigations of Berenson's vague acknowledgment that his captains had "got too carried away" with freshman hazing prior to 2012.

474. Unlike UM, Plaintiffs did not and could not have reasonably known until no earlier than late 2024 that UM put them at risk of sexual assault.

475. Most Plaintiffs did not know that Red Berenson was aware of or condoned the sexual abuse.

476. None of the Plaintiffs knew that Berenson had grossly diminished and misrepresented the nature of the hazing they had endured when he publicly announced an end to freshman hazing within the program in 2012.

477. For Plaintiffs who were aware that Berenson and other coaching staff knew of the sexual abuse, the coaches' acceptance of the abuse intimidated and discouraged players from doing anything to stop or report the hazing.

478. Berenson retaliated against at least one player who complained about the sexual abuse by cutting his playing time permanently, damaging his professional career on a permanent basis.

479. Comments from coaches, including Berenson, normalized and minimized the abuse and further discouraged players from speaking out.

480. Perpetrators of sexual abuse often normalize and minimize abuse, which causes victims to question their experience and doubt whether they should speak out.

481. Nearly all of the Plaintiffs attended the University of Michigan on an athletic scholarship.

482. Given Berenson's punitive coaching style, Plaintiffs reasonably feared retaliation if they reported the abuse.

483. Such retaliation could take place in the form of temporary or long-term benching, social ostracization facilitated by Berenson, outright personal hostility from Berenson, or possibly worse.

484. Benching and ostracization by the team would negatively affect a Plaintiff's hockey career by interfering his with stats and undermining the quality of

his play on the ice. This could have long-term negative consequences for his prospects to play professional hockey.

485. UM maintained a policy, practice, and custom of deliberate indifference to sexual abuse of student-athletes on the Men's Ice Hockey team.

486. UM failed to implement and enforce appropriate policies and procedures to prevent, and properly respond to, severe hazing and sexual assaults of its students.

487. UM staff ignored and concealed complaints of sexual assaults in the Men's Ice Hockey Program.

488. UM concealed the tradition of sexualized hazing on the Men's Ice Hockey team for decades, and that concealment continues to this day.

489. To date, UM has never publicly acknowledged the sexualized hazing or violent hazing on the Men's Ice Hockey Team under Red Berenson.

490. Although UM received complaints from student-athletes, no student or staff member was ever investigated or disciplined for sexualized hazing.

491. This knowing failure to investigate is part of the decades-long concealment of sexual abuse on the Men's Ice Hockey team.

492. Defendants and their employees, agents, and representatives fraudulently concealed the existence of Plaintiffs' claims by (a) concealing from Plaintiffs, and those similarly situated, specific incidents and the tradition of

sexualized hazing on the Men's Ice Hockey Team; (b) concealing from Plaintiffs, the public, and law enforcement authorities that the coaching staff, including the Head Coach, had observed and in some cases participated in the sexualized hazing, and encouraged the sexual abuse by instructing upperclassmen on the location and method of certain abuse and minimizing, normalizing, and joking about the abuse; (c) concealing the abuse and the role of the coaching staff from Title IX reporting authorities in order to preserve federal funding; (d) concealing the abuse and the role of the coaching staff from federal authorities by filing false and incomplete reports under the Clery Act from 1990 through the duration of Berenson's coaching tenure; (e) instructing upperclassmen to conceal evidence of the sexual abuse from others by shaving only "from the neck down"; (f) by grossly misrepresenting to the press that the program's hazing traditions were tame and that former captains had merely "got too carried away"; and (g) by not investigating Berenson's obvious but vague acknowledgment that more severe hazing had occurred within the program during his tenure.

**<u>Damages</u>**

493. All of the Plaintiffs were elite college athletes and highly skilled hockey players who were selected by the UM Hockey Program as some of the best in nation, all with specific prospects to play professional hockey, including in the National Hockey League, American Hockey League, and Ontario Hockey League.

494. Nearly all of the Plaintiffs attended the University of Michigan on an athletic scholarship and depended on hockey to access their education.

495. As a result of the sexual abuse that was permitted and facilitated by UM, the John Doe Plaintiffs have suffered and continue to suffer losses including and not limited to: physical injury, emotional distress, loss of enjoyment of life, lost educational opportunities and benefits, lost tuition, lost professional opportunities including lost or diminished opportunities to play professional hockey, lost earnings and earning capacity, and healthcare treatment costs, including costs for counseling and substance misuse and addiction treatment.

496. For the Plaintiffs who knew that certain coaches were indifferent to the abuse, the University's institutional indifference and indeed facilitation of the abuse intensified and worsened the traumatic impact of the sexualized hazing.

497. When a person reports sexual abuse but is met with indifference or similar institutional betrayal, they are likely to suffer more severe symptoms of post-traumatic stress disorder (PTSD) and depression.[9]

---

[9] *See, e.g.*, Freyd, Jennifer, WHAT IS BETRAYAL TRAUMA (2008); C. Smith, J. Freyd, DANGEROUS SAFE HAVENS: INSTITUTIONAL BETRAYAL EXACERBATES SEXUAL TRAUMA, Journal of Traumatic Stress, Vol. 26, 119–124 (Feb. 2013), available at https://pubmed.ncbi.nlm.nih.gov/23417879/; Monteith LL, Bahraini NH, Matarazzo BB, Soberay KA, Smith CP., *Perceptions of Institutional Betrayal Predict Suicidal Self-Directed Violence Among Veterans Exposed to Military Sexual Trauma*, 72(7) J Clin Psychol. 743-55 (July 2016).

498. Typical for many survivors of sexual abuse, Plaintiffs have experienced profound shame that this happened and guilt that they could not stop it from happening to themselves and others.

499. Symptoms of male sexual abuse on heterosexual male adults can last for decades and affect their lives in many ways, and may include sexual dysfunction, compromised ability in close relationships with others, confusion about sexual identity, intense embarrassment, depression, and post-traumatic stress disorder (PTSD) caused by both the actual assault and the perception that the assault could intensify to even greater violence and violation.[10]

500. Psychological damage from sexual abuse is often intensified when the perpetrator is known and trusted by the victim.[11]

501. For Plaintiffs who were subjected to abuse as freshmen and then coerced to abuse others when they became upperclassmen, they have suffered additional psychological damage known in clinical terms as "moral injury."

---

[10] See Male Victims of Male Sexual Assault: A Review of Psychological Consequences and Treatment (Sexual and Relationship Therapy, August 2001); Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007, pp. 22–35).
[11] Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond (EVAW's OnLine Training Institute, May 2019, p. 34).

502. Moral injury refers to the psychological impact of "perpetrating, failing to prevent, or bearing witness to acts that transgress deeply held moral beliefs."[12]

503. Institutional betrayal by UM is ongoing as the University and Regents have never publicly acknowledged or taken action to correct or prevent the sexualized abuse on the Men's Ice Hockey Team.

## COUNT I
## SEX DISCRIMINATION
## TITLE IX

504. Plaintiffs incorporates the above allegations as if stated in full herein.

505. The University receives federal financial support for its educational programs and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. § 1681(a), et seq.

506. Title IX provides that "No person in the United States shall on the basis of sex, be . . . subject to discrimination under any education program or activity receiving Federal financial assistance . . ."

507. Each Plaintiff is a "person" under the Title IX statutory language.

[12] Litz, Brett T.; Stein, Nathan; Delaney, Eileen; Lebowitz, Leslie; Nash, William P.; Silva, Caroline; Maguen, Shira (December 2009). *Moral injury and moral repair in war veterans: A preliminary model and intervention strategy.* Clinical Psychology Review 29 (8): 695–706. doi:10.1016/j.cpr.2009.07.003. PMID 19683376.

508. As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

509. Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual touching, sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature

510. Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties. Title IX requires UM to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

511. UM high level officials with the authority to end the sexual abuse had actual knowledge of physically violent and dangerous hazing in the Men's Hockey Program in 1980 as a result of the JT Todd hazing incident.

512. UM high level officials with the authority to end the sexual abuse had actual knowledge of the of sexual assaults of freshmen participants in the Hockey Program through staff and upperclassmen with this knowledge beginning in 1984.

513. UM high level officials, with the knowledge described above, had the authority to address the risk posed by the sexual assaults, and had the authority to take corrective measures by, among other things, closely supervising the Hockey Program or ordering complete curtailment of all hazing activities.

514. UM's failure to address the substantial risk posed by the upperclassmen of the Hockey Program, given prior complaints and reports about their inappropriate conduct, was clearly unreasonable in light of the known circumstances.

515. The Board of Regents failure to set appropriate sex discrimination policy, in light of UM's failure to address the substantial risk posed by the upperclassmen in the Hockey Program was clearly unreasonable in light of the known circumstances.

516. By their acts and omissions, Defendants were deliberately indifferent to the substantial risk that upperclassmen would sexually assault freshmen in the UM Hockey Program.

517. The sexual harassment that Plaintiffs suffered was sexualized and violent hazing by same-sex peers is sex discrimination that violates Title IX because the hazing is committed on the basis of sex.

518. Pursuant to Title IX, Defendants were obligated to investigate allegations of violent and/or sexualized hazing.

519. The University and Regents acted with deliberate indifference to sexualized hazing by failing to investigate known reports of such hazing, failing to implement policies to prevent and correct such hazing, hiring and retaining coaching personnel who condoned and perpetuated such hazing, and failing to institute corrective measures.

520. These failures were clearly unreasonable in light of the known circumstances and effectively denied Plaintiffs equal educational opportunities at the University.

521. Defendants maintained a policy and/or practice of deliberate indifference to sexualized hazing between male peers based on a stereotype that "boys will be boys."

522. Defendants' policy and/or practice of deliberate indifference created and increased the risk of continued or intensified sexualized hazing.

523. As a result of Defendants' deliberate indifference, Plaintiffs have suffered loss of educational opportunities and benefits.

524. As a result, Plaintiff has suffered damages and injuries as alleged above.

**Request for Relief**

525. Plaintiffs have suffered the damages and injuries as alleged above.

Accordingly, Plaintiff requests the following relief:

a. An order awarding all damages, past and future, in an amount they are found to be entitled to;

b. An order awarding all punitive and liquidated damages in an amount they are found to be entitled to;

c. An order awarding all costs, interest, expenses, and attorney fees;

d. Equitable relief, including and not limited to sexualized hazing prevention training for all University of Michigan athletes.

e. An order granting her all such other relief as the court deems just and equitable.

Respectfully submitted,

Pitt McGehee Palmer Bonanni & Rivers, P.C.

By: *s/ Michael L. Pitt*
Michael L. Pitt (P24429)
Kevin M. Carlson (P67704)
Danielle Y. Canepa (P82237)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

Dated: September 9, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES 1 –16,

Plaintiff,

Case No.
Hon.

v.

THE REGENTS OF THE
UNIVERSITY OF MICHIGAN;
and the UNIVERSITY OF MICHIGAN,

Defendants.

---

PITT MCGEHEE PALMER BONANNI &
RIVERS, P.C.
Michael L. Pitt (P24429)
Kevin M. Carlson (P67704)
Danielle Y. Canepa (P82237)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

---

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues within the causes of action.

Respectfully submitted,

Pitt McGehee Palmer Bonanni & Rivers, P.C.

*/s/Michael L. Pitt*
Michael L. Pitt (P24429)
Kevin M. Carlson (P67704)
Danielle Y. Canepa (P82237)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

Dated: September 9, 2026